**UNITED STATES of America**

v.

**Roosevelt V. FOSKEY, Appellant.**

**No. 79–2117.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 8, 1980.

Decided Aug. 5, 1980.

Ed Wilhite, Washington, D. C., for appellant.

Thomas C. Hill, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry and Roger N. Adelman, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before ROBB and MIKVA, Circuit Judges, and GESELL *, United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

By indictment filed March 27, 1979, appellant Roosevelt V. Foskey and two co-defendants, Curry Brunson and John Hicks, were charged with possession of, and possession with intent to distribute, phenmetrazine and dilaudid. Appellant, along with the other defendants, made a pretrial motion to suppress the narcotics on Fourth Amendment grounds. Following a hearing, the motion was denied. Thereafter Foskey moved to suppress certain statements he made after his arrest, which motion was similarly denied after a hearing. Prior to trial the district court also ruled that the Government could introduce at trial a 1976 arrest of Foskey and Brunson for possession of phenmetrazine and dilaudid.

The district court granted Hicks' motion to sever his case from those of his two co-defendants, and Foskey and Brunson were tried together before a jury. At the conclusion of two days of trial, the jury deliberated for approximately two hours, returning the next day for another hour before reaching a verdict. Foskey and Brunson were found guilty of possession of phenmetrazine and dilaudid, but both were acquitted on the two more serious counts of possession with intent to distribute.

Shortly thereafter Foskey and Brunson moved for new trials based on the discovery of new evidence, specifically, the Government's possession of a prescription for dilaudid in Foskey's name. The district court granted the motion as to Brunson but denied it as to Foskey. Foskey had also moved for a mistrial because of a statement by one of the jurors that she did not want to return for a second day of deliberations and that being forced to do so might "hinder" her vote. This motion was similarly denied by the court.

The court imposed two consecutive one-year sentences on Foskey, and this appeal followed. Foskey renews on appeal each of the objections raised below. We consider them in turn. Because we find that the court erred in permitting the introduction of the evidence of a prior arrest, we reverse Foskey's conviction and remand for a new trial.

## I. FACTS SURROUNDING THE ARREST

Approximately one week before appellant's arrest, the police received a tip from a reliable informant that Foskey, possibly accompanied by Brunson and Hicks, would be coming to Washington from New York to conduct a drug transaction involving large quantities of phenmetrazine and dilaudid. The informant said that the transaction would take place between midnight and 3:00 A.M. on February 25, 1979, at a particular hotel in Washington. The informant also noted that appellant and his companions would likely be using a car belonging to Foskey's common-law wife.

The police prepared affidavits for search warrants for an automobile and for a room at the hotel, on the assumption that the transaction would occur inside. Because the license plate number of the car and the hotel room number were not known at that time, the police arranged to call the issuing magistrate with this information as soon as it was available, thus completing the affidavits orally so that the warrants could be issued.

The police set up a surveillance of the hotel and at 2:05 A.M. spotted the suspect car, occupied by three men. Appellant got out of that car and entered another one in the lot, occupied by a woman. Hicks and Brunson also exited the suspect car; one went into the restroom of an adjoining gas station, the other entered a nearby telephone booth. It thus appeared that the drug transaction would be conducted in the parking lot, not inside the hotel. Because the change in circumstances required immediate action, the police moved in without

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

securing a warrant. They detained and searched the three men and, not finding the drugs on their persons, proceeded to search the suspect car. Under the gas flap of the automobile, which was unlocked, the police found a brown paper bag fastened around the neck of the gas pipe. Inside that bag were several plastic bags containing 150 phenmetrazine pills and 40 dilaudid tablets. Foskey, Brunson, and Hicks were then arrested.

At the time of the arrest, all three men were given the standard warnings prescribed in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The *Miranda* warnings were repeated at the station. Foskey did not sign the "waiver of rights" card, across which was then written the word "refused." At one point, a detective asked all three men simultaneously who owned the car. Each denied knowledge of whose car it was. Sometime later, without any further question being put to him, Foskey said, "Look, it's my old lady's car. She didn't know what was in it. She didn't know what it was being used for." Trial transcript (Tr.) at 122. This statement, along with the evidence of the drugs found in the paper bag, was introduced by the prosecution at Foskey's trial.

## II. ADMISSIBILITY OF THE DRUGS

■ There is little question, nor does appellant dispute, that the police had probable cause to make the arrest and conduct a search based on the informant's tip. *See Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959). Nor is there any question that the police could legally search the car without a warrant. *See Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).[1] Foskey contends, however, that opening the paper bag without a warrant was a violation of the Fourth Amendment.

One may perhaps argue that a paper bag is at times, like a suitcase, "a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy." *Arkansas v. Sanders*, 442 U.S. 753, 762, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979). That argument becomes less plausible, however, when the paper bag in question is wrapped around the gas pipe of an automobile. Certainly that location, a peculiar one for carrying items of a personal nature, undercuts any reasonable inference that this particular paper bag was being used as a substitute for luggage.[2]

In addition, the absence of precautions to preserve privacy is relevant to the question of reasonable expectation of privacy. *See Rakas v. Illinois*, 439 U.S. 128, 152, 99 S.Ct.

[1]. The more lenient requirements applied to automobile searches are particularly appropriate in a situation such as this involving a last-minute change in circumstances that prompted action by the police sooner than they had anticipated. *See Cardwell v. Lewis*, 417 U.S. 583, 595–96, 94 S.Ct. 2464, 2472, 41 L.Ed.2d 325 (1974) ("Exigent circumstances with regard to vehicles are not limited to situations where probable cause is unforeseeable and arises only at the time of arrest. The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action.") (citation omitted); *Chambers v. Maroney*, 399 U.S. 42, 50–51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970) ("[T]he circumstances that furnish probable cause to search a particular auto for particular articles are most often unforeseeable; moreover, the opportunity to search is fleeting since a car is readily movable."). The exact level of exigency is unclear here because the police did call the magistrate for advice after detaining Foskey and his two companions and before searching the car. The better procedure would have been to seek a warrant from the magistrate at that time–a warrant which the magistrate testified at a pretrial hearing he would have issued. But the failure to do so does not render the search impermissible under the Fourth Amendment's standards for automobile searches.

[2]. In a case to be heard en banc next term, this court will be faced with a similar question–whether there is a reasonable expectation of privacy in an ordinary paper bag carried in a car. *United States v. Ross*, No. 79–1624, re-hearing en banc granted (D.C. Cir. June 26, 1980). Our decision here does not depend upon the resolution of the issue raised in that case.

421, 435, 58 L.Ed.2d 387 (1978) (Powell, J., concurring). Here, no precautions were evident. Instead, the placement of the bag around the gas pipe was so peculiar that anyone—for example, a gas station attendant—who had reason to lift up the flap might well have been motivated by curiosity or concern to look into the bag. The location of this property thus does not "manifest[ ] an expectation that the contents would remain free from public examination." *United States v. Dien*, 609 F.2d 1038, 1045 (2d Cir. 1979).

Appellant argues that a person might reasonably expect that no one would normally look under the gas flap. Furthermore, in these days of self–service gas stations, even a gas station attendant might not be expected to do so. We are not entirely convinced that this location is so inviolate that no one could be expected to look there. In any case, the relevant inquiry is not whether a gas station attendant, for example, would open the flap, but rather, once justifiably having done so and thus being in the same position as the police in this case, whether it would be unreasonable to imagine him taking the further step of looking inside the paper bag.

Finally, a lower expectation of privacy may be justified when the defendant is not in possession of the item searched. *See Rakas*, 439 U.S. at 154–55, 99 S.Ct. at 436–37 (Powell, J., concurring). In this case, the bag was located in a place to which anyone could have had access, making its possessory relationship to the driver and passengers of the vehicle much less clear. Indeed, this may be the very reason that the bag was placed there. In the absence of any clear possessory relationship between the occupants of the car and the bag, the argument that a reasonable expectation of privacy existed therein is even further weakened. *Id.*

Based on all the factors discussed above, it seems clear that appellant could not prevail on his argument that he had a reasonable expectation of privacy in this particular paper bag. We thus hold that the district court was correct in ruling that the evidence of the drugs was properly admitted at trial.

## III. ADMISSIBILITY OF APPELLANT'S POST–ARREST STATEMENTS

Foskey contends on appeal that the Government failed to establish that he waived his *Miranda* rights before he was questioned about the car, and thus that the statement regarding his "old lady's" ownership thereof was improperly admitted at trial. Appellant does not dispute that he was given his *Miranda* warnings on two separate occasions after his arrest and prior to any questioning of him. However, he argues that the notation "refused" on the waiver of rights card is sufficient to raise a question regarding whether he knowingly and intelligently waived his rights when he was later questioned.

The Government responds that, as the trial court found, the statement was a spontaneous utterance and therefore admissible as falling outside the scope of *Miranda*. In any case, the Government argues, the evidence is sufficient to support a finding that Foskey knowingly and intelligently waived his *Miranda* rights at the time the statement was made.

As the Supreme Court stated in *Miranda*, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U.S. at 478, 86 S.Ct. at 1630. After an evidentiary hearing, the district court concluded that Foskey's statement was spontaneously volunteered. At the hearing, the police officer to whom the statement had been made testified that he had asked the question about the ownership of the automobile in the course of preparing the paperwork for booking the defendants. At one point in completing a form, the officer said, he looked up and asked who owned the car, noted the answers, and then went back to typing the form. A short time after the officer resumed typing, Foskey made the disputed statement. Thus, the original question appears to have been an isolated

inquiry rather than part of a general interrogation. Consequently, Foskey's statement was not made in the course of interrogation, nor was it in response to a pending question. Under these circumstances we do not think the trial court's finding of spontaneity was clearly erroneous.[3]

In light of our holding on spontaneity, we need not rule on the Government's contention that Foskey waived his *Miranda* rights. The district court likewise made no specific ruling on the question. Had a decision on the issue been necessary, however, the record would have provided evidence supporting a finding that Foskey did waive his rights at the time the controversial statement was made. Whether a defendant knowingly and intelligently waived *Miranda* rights is a determination that must be made in light of the totality of the circumstances surrounding the questioning. *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Even though mere silence is not enough to establish a waiver of rights under *Miranda*, "[t]hat does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights." *Butler*, 441 U.S. at 373, 99 S.Ct. at 1757.

In this case, Foskey was given complete warnings on two separate occasions. Both times he was in the company of Brunson and Hicks. The record contains no suggestion that he expressly indicated an intent to invoke his rights. He claims, however, that some ambiguity was created by the notation on the card, which might indicate that he refused to answer questions. But the officer who questioned Foskey testified that he understood the notation to mean that Foskey simply refused to sign the card. This court has held that "a refusal to sign a waiver [does not mean] that the person interrogated is assuming a contradictory position with respect to his willingness to respond to oral questions, whatever may be his motive in so doing." *United States v. Cooper*, 499 F.2d 1060, 1062 (D.C. Cir. 1974); *United States v. Frazier*, 476 F.2d 891, 897–98 (D.C. Cir. 1973) (en banc); *accord, Eleuterio v. Wainwright*, 587 F.2d 194, 196 (5th Cir.) (per curiam), *cert. denied*, 443 U.S. 915, 99 S.Ct. 915, 61 L.Ed.2d 879 (1979).

It is noteworthy in this regard that Foskey did not testify at the suppression hearing in support of his proposed interpretation of the notation on the waiver card, even though he could have done so without fear of having that testimony used against him at trial. *Simmons v. United States*, 390 U.S. 377, 389–94, 88 S.Ct. 967, 973–76, 19 L.Ed.2d 1247 (1968); *Bailey v. United States*, 389 F.2d 305, 310–11 (D.C. Cir. 1967).

Foskey had been arrested before and thus was not a novice to the *Miranda* procedure. He was in the presence of two companions when the original question about the ownership of the car was asked, so there does not appear to be any intimidation resulting from isolation. *See Miranda*, 384 U.S. at 448–50, 86 S.Ct. at 1614–15. And there is

---

3. Some courts have ruled that questions designed merely to obtain background information for booking purposes are outside the scope of *Miranda*. *See United States ex rel. Hines v. LaVallee*, 521 F.2d 1109, 1112–13 (2d Cir. 1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976); *United States v. Menichino*, 497 F.2d 935, 939–41 (5th Cir. 1974); *United States v. La Monica*, 472 F.2d 580 (9th Cir. 1972). An earlier case from this circuit, however, found that *Miranda* was intended to cover questions asked by a police officer while filling out a lineup sheet on the defendant. *Proctor v. United States*, 404 F.2d 819, 820–21 (D.C. Cir. 1968). A recent Supreme Court case defines interrogation under *Miranda* to include "express questioning or its functional equiva-

lent," that is, "words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 302, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980) (emphasis in original). In light of that ruling, it may well be that questions asked during the booking process are not interrogation for *Miranda* purposes: such questions may not meet the second prong of *Innis* and, though express questions, may not be considered part of "express questioning." *Innis* does not clearly resolve the conflict among the circuits, however, and given our holding that Foskey's statement was spontaneous, we need not decide whether it was outside the scope of *Miranda* for yet another reason.

no evidence of otherwise particularly coercive circumstances existing at the time of the questioning. Added to this, as noted above, Foskey essentially volunteered the statement in a non–interrogative setting. Although we do not and need not here rule that waiver in fact occurred, all of these factors tend to support such a finding.

## IV. ADMISSIBILITY OF THE PRIOR ARREST

At trial, evidence was introduced that on September 19, 1976 (approximately two–and–one–half years prior to the arrest in this case), Foskey was arrested with Brunson for possession of the same kinds of drugs for which they were arrested here. Apparently Foskey and Brunson were in a room in a hotel, located approximately one mile from the scene of the arrest in this case, when the police entered and searched a clothing bag that Brunson was carrying. In the pocket of a jacket contained in the bag, the police found a quantity of drugs, including some phenmetrazine and dilaudid capsules. Brunson immediately asserted that the drugs belonged to him, and no charges were ever filed against Foskey.

It is fundamental to American jurisprudence that "a defendant must be tried for what he did, not for who he is." *United States v. Myers*, 550 F.2d 1036, 1044 (5th Cir. 1977), *cert. denied*, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978). That precept is, as the Fifth Circuit noted in *Myers*, "[a] concomitant of the presumption of innocence." *Id.* Accordingly, Federal Rule of Evidence 404(b) was enacted, which provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however,

be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Therefore, evidence of a defendant's prior "bad acts" is excluded when its sole tendency is to prove that the defendant is a person of bad character and thus predisposed to commit the crime for which he is on trial. Despite the inherently damaging nature of bad acts evidence, it may be admissible to show a material issue in the case such as motive, opportunity, intent, identity, or absence of mistake or accident. Unless the Government can establish the relevancy of the evidence to some such issue in the criminal trial, the evidence must be excluded. *United States v. Day*, 591 F.2d 861, 870–71 (D.C.Cir.1978); *United States v. James*, 555 F.2d 992, 998–99 (D.C.Cir.1977).

■ Even bad acts evidence that admittedly is probative of one of the issues listed in Rule 404(b) may nevertheless be excluded. Rule 404(b) does not offer a "mechanical solution," but provides, by its very terms, only that such evidence "may" be admissible. Advisory Committee's Note to Rule 404. A second step is then required:

The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403.

*Id.* Our consideration of the admissibility of the evidence of the prior arrest in this case thus necessitates discussion of both Rule 404(b) and Rule 403.[4]

### A. *Rule 404(b)*

■ We note that the only possible relevance the prior arrest might have under the terms of Rule 404(b) is to prove intent.[5]

---

**4.** Federal Rule of Evidence 403 provides in full:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**5.** The Government's theory of the relevance of the prior arrest, and the district court's rationale for admitting the evidence, are somewhat obscured by the record. In the district court's pretrial order of June 21, 1979, the evidence was ruled admissible under Rule 404(b) to show plan or scheme. Given the time period separating the two arrests, and the Government's failure to provide any evidence of a

But "[w]hen a prior criminal act is relied upon to prove intent or knowledge, similarity between the two events must be shown to establish the threshold requirement of relevance." *United States v. Hernandez–Miranda*, 601 F.2d 1104, 1108 (9th Cir. 1979); *United States v. Corey*, 566 F.2d 429, 431–32 (2d Cir. 1977); *United States v. Kirk*, 528 F.2d 1057, 1060 (5th Cir. 1976). In this case, the prior arrest is dissimilar from the crime for which defendant was on trial with respect to precisely the relevant element–intent.

■ At the time of the prior arrest, Brunson promptly asserted possession of the drugs that were hidden in his clothing; as a result, Foskey was not even charged with an offense. The inference to be drawn is that Foskey did not have knowledge of the drugs or intent to possess them. Such evidence can hardly form a basis in this case for the opposite inference–that he intended to possess the concealed drugs. The mere fact that a person was in the company of another who possessed drugs simply is not sufficient to justify a conclusion that he himself knowingly possessed drugs two–and–one–half years later. Absent the linchpin element of intent in the prior incident, it lacks the necessary similarity and relevance to justify its admission under Rule 404(b).

We have carefully searched the record in this case to ensure that no evidence satisfactorily links the two incidents for purposes of Rule 404(b). Our examination disclosed in fact, evidence not cited by the Government in its brief, which might arguably be probative of intent. At the time of the arrest in this case, Foskey told his companions that three of them were present, but that only one had to be. Brunson responded, "Not me. Not again. Can't do it." Tr. at 124. The statement "[n]ot again" could arguably be construed to refer to the prior arrest and to indicate that Brunson had "taken the rap" for Foskey then and was unwilling to do so again. This inference would support the view that Foskey had in fact known about the drugs during the prior incident, but escaped suspicion only by Brunson's misleading tactic.

Despite consideration of this further evidence, we still conclude that evidence of the prior arrest should have been excluded. Even when viewed in the light most favorable to the Government, the evidence is extremely weak.[6] Brunson's statement makes no specific reference to the 1976 incident, or to Foskey. It is significant that two–and–one–half years had passed since the prior arrest. The lack of specific reference thus makes it easily possible that Brunson was alluding to some other event. This evidence was completely inadequate to support any reasonable inference that Foskey had the intent to possess the drugs at the time of the prior arrest, and therefore the requisite degree of relevance for admis-

continuing criminal relationship between Brunson and Foskey, the earlier arrest was not probative of plan or scheme. *See United States v. Burkley*, 591 F.2d 903, 920 (D.C.Cir.1978), *cert. denied,* 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979) ("[A] common scheme or plan embrac[es] the commission of two or more crimes so related to each other that proof of the one tends to establish the other."); *accord, United States v. Manafzadeh*, 592 F.2d 81, 88 (2d Cir. 1979) (distinguishing " 'a connected or inseparable transaction,' in which all the crimes figured" from "entirely separate, later transactions"). The Government apparently realized that it had "used that phrase [plan or scheme] rather loosely" and decided at trial that the 1976 arrest should instead be offered on the issues of identity and intent. Tr. at 15.

But identity was not an issue at trial, and prior crimes evidence may not be introduced on issues that are not contested. *See United States v. James*, 555 F.2d 992, 1000 & n.46 (D.C.Cir.1977), and cases cited therein. Foskey was unquestionably one of the men in the car; the only issue was whether he had the intent to possess the drugs secreted under the gas flap. *Cf. United States v. DeVaughn*, 601 F.2d 42, 46 (2d Cir. 1979); *United States v. Day*, 591 F.2d 861, 872–73 (D.C.Cir.1978) (cases in which identity was at issue).

**6.** In reviewing the record, we take into account not only the evidence itself, but also the manner in which it was presented to the jury. The evidence we have culled from the record, which we have quoted above, was presented in a disorganized and confusing fashion, raising serious doubts whether its import was even made clear to the jury.

sibility under Rule 404(b) was not met. *See United States v. Beechum*, 582 F.2d 898, 913 (5th Cir. 1978) (evidence must be sufficient to support jury finding that defendant in fact committed prior bad act), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

### B. *Rule 403*

Even if the prior arrest were marginally relevant to one of the issues listed in Rule 404(b), it should surely have been excluded in the second stage of analysis of admissibility under that rule. Bad acts evidence must satisfy Federal Rule of Evidence 403; here, the prior arrest should have been ruled inadmissible on the ground that its minimal relevance was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Although the balancing contemplated by Rule 403 is a matter within the discretion of the trial court and should be overturned on appeal only in cases of abuse of that discretion, *see Miller v. Poretsky*, 595 F.2d 780, 783 (D.C.Cir.1978); *United States v. Day*, 591 F.2d 861, 878–79 (D.C. Cir.1978), we find that standard met in this case.[7]

In *United States v. James*, 555 F.2d 992 (D.C.Cir.1977), we reversed appellant's conviction even though the bad acts evidence was linked significantly closer to the offense charged than was the prior arrest in this case. The evidence at issue in *James* was the defendant's arrest, in an apartment where large quantities of heroin were stored, sixteen days after his arrest for distributing heroin. At James' trial on the earlier incident, the Government introduced the evidence of the later event to establish defendant's intent to distribute heroin. As summarized in *James*:

The issue thus resolves itself into whether James' presence in an apartment in which were found substantial quantities of heroin is probative of an intent to distribute other heroin sixteen days earlier. Granting that a person found in that situation might be more likely so to contemplate, such an inference is so weak as to bring into serious question whether its contribution to the accuracy of the trial process outweighed the likelihood that its dramatic flavor would derange it.

555 F.2d at 1000 (footnotes omitted). After careful weighing, the *James* court determined that the evidence should have been excluded under Rule 403.

Comparing the facts in *James* with the present case, we become convinced that the evidence here should likewise have been excluded. Foskey was arrested two–and–one–half years earlier in a hotel room in which a relatively small quantity of drugs was found, possession of which was immediately claimed by another. Clearly, the prejudice attendant an inference that Foskey is a drug possessor because he associates with drug possessors is much stronger than any probative value this evidence could have with respect to Foskey's intent to possess drugs either in 1976 or 1979.

Rules 403 and 404(b) are not obstacles to be cleared at all costs, even by cutting around corners whenever it is possible to do so. These rules were designed to ensure a defendant a fair and just trial based upon the evidence presented, not upon impermissible inferences of criminal predisposition or by confusion of the issues. The district court, required to make on–the–spot decisions, does not have the luxury of engaging in the type of careful balancing we have undertaken here and in *James*. There is a large measure of responsibility in the prosecutor to weigh the evidence independently:

---

**7.** The trial judge has the responsibility for making sure that the record reflects the balancing of the considerations articulated in Rule 403. *See Miller v. Poretsky*, 595 F.2d 780, 794 n.41 (D.C.Cir.1978) (Robinson, J., concurring, in an opinion concurred in by the majority); *United States v. Robinson*, 530 F.2d 1076, 1081 (D.C. Cir.1976). The record here contains no indica-

tion of any such weighing. In fact, the bad acts evidence was initially ruled admissible to prove scheme or plan; when the Government changed its tack at trial and decided that the prior arrest's relevance was really to identity and intent, *see* note 4 *supra*, the trial court acquiesced without further comment.

if its relevance is outweighed by the danger of unfairly prejudicing, confusing, or misleading the jury, it should not be introduced. The assistant United States attorney must step back from his or her partisan role and make these determinations in an objective and fair–minded fashion before proffering the evidence.[8]

The Government did not live up to that responsibility here. The evidence of the 1976 arrest was not relevant to any issue in the case, was extremely prejudicial because it tended to prove only the defendant's criminal predisposition, and was not even necessary to prove the prosecution's case. We therefore hold that the evidence was inadmissible under both Rules 404(b) and 403. As noted by another circuit in a recent case, "[t]he government had no business offering such evidence," *United States v. Bettencourt*, 614 F.2d 214, 218 (9th Cir. 1980), and we expect that in the future it will refrain from doing so.

Because we hold that admitting the evidence of the prior arrest was prejudicial error, we reverse appellant's conviction and remand for a new trial.[9]

*Reversed and remanded.*

---

8. We would suggest that in future cases the Government exercise the discretion given it by Fed.R.Crim.P. 12(d)(1) and notify the defense before trial of its intention to introduce any evidence of prior bad acts. If the defense then raises a motion to suppress, the Government should supply the district court with a written analysis of the logical inferences justifying admission of the evidence. Given the complexity of these questions, and the ease of confusion of permissible with impermissible inferences, such a procedure might obviate the need for the district court, as well as the court of appeals, to speculate regarding the Government's theory of the evidence's relevance to the issues listed in Rule 404(b).

9. Because appellant will receive a new trial, we do not find it necessary to discuss the problem created by the reluctant juror. Similarly, appellant is now fully aware that the Government has evidence of a prescription for dilaudid in his name, and therefore we need not address his motion for a new trial. We do not intend thereby to intimate, however, any approval of the Government's game of laying a trap for appellant by failing to disclose to him its possession of the allegedly fraudulent prescription and then asserting in closing argument, and again in closing rebuttal, "[t]here is no evidence of a prescription here." Tr. at 266–I, 266–JJ.